IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ANITA CASTRO SARABIA,

Plaintiff,

v.

BULMARO RUIZ PEREZ,

Defendant.

Case No. 6:16-cr-01045-MC

FINDINGS OF FACT AND CONCLUSIONS OF LAW

MCSHANE, Judge:

Plaintiff Anita Castro Sarabia ("Castro") filed a complaint requesting this court order the return of KMRC[1], her seven year old son with defendant Bulmaro Ruiz Perez ("Ruiz"), to Mexico. Castro argues Ruiz wrongfully retained KMRC in the United States during what was supposed to be a two month visit for medical treatment. On November 29 and 30 of 2016, I presided over a bench trial in this matter.[2] These findings of fact and conclusions of law follow that hearing. Because I conclude the United States remains KMRC's country of habitual residence, Castro's petition for return is DENIED.

[1] As KMRC is a minor, I identify him only by his initials.

[2] Castro's attempts at securing a visa to attend the hearing proved unsuccessful. The court's own efforts, via the United States Central Authority also proved unsuccessful. As the options were to wait several months to learn the decision of the Department of Homeland Security or proceed via a hearing where Castro would appear via videoconference, the court chose the latter option. Fortunately, the Mexico City Central Authority provided a videoconference room for Castro to use during the hearing.

**FINDINGS OF FACT**

In 2008, Castro and Ruiz met at a church in Albany, Oregon. They lived together for a few months before separating. Two months after the separation, Castro learned she was pregnant with Ruiz's child, KMRC. When Castro informed Ruiz she was pregnant, Ruiz immediately told Castro he would help support the child. Even before KMRC's birth, Ruiz began making monthly child support payments to Castro. At trial, Castro tried to minimize the consistency of Ruiz's payments. While the parties did not seek a support order from a court, Ruiz produced bank statements demonstrating a general pattern of consistent monthly payments to Castro.[3]

Castro gave birth to KMRC in April 2009. As was the case with the monthly support payments, Castro attempted in her testimony to minimize Ruiz's involvement in KMRC's life, initially stating that Ruiz visited the child only once and only in order to sign the birth certificate. Castro later testified Ruiz visited KMRC only two or three times between April 2009 and September 2011.[4] Castro testified that one of those visits was to sign the birth certificate and another was to obtain KMRC's passport. Ruiz, on the other hand, testified that although he worked during the week and lived about an hour's drive away, he visited KMRC on many weekends. Ruiz testified he would take KMRC shopping to buy toys and "little things like that." While Ruiz clearly was not a daily fixture in KMRC's life, I find his testimony more credible than Castro's. Rather than simply signing the birth certificate, Ruiz was at the hospital and held KMRC on the date of his birth. He was aware that Castro had gone into labor and was present

---

[3] The monthly payments totaled $2,500 in 2009, $3,273 in 2010, and $4,179 in 2011. When Castro took KMRC to Mexico in late 2011, Ruiz continued with monthly payments averaging about $200 per month until 2015. KMRC returned to the United States in September 2015. That year, Ruiz made monthly payments of approximately $100 per month through September.

[4] Castro and Ruiz testified through an interpreter. In addition to the in-court interpreter, Castro had an interpreter with her in Mexico City to interpret the courtroom proceedings outside her own testimony. This situation, while less-than ideal, was the best available given the limited options.

2 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

enough to know that the baby was born premature. Ruiz's testimony that he and Castro remained in regular communication during this time is credible. Castro's attempts to minimize Ruiz's involvement in KMRC's life while in the United States are simply not credible in light of all of the evidence.

In 2011, Castro decided to go to Mexico. The intent underlying this decision is hotly contested and forms the crux of the parties' arguments in this case. I find Ruiz's testimony credible. Ruiz testified the parties got into an argument in mid-2011 when Castro called Ruiz and informed him she was taking KMRC to Mexico to visit her parents. Ruiz, who did not want KMRC going to Mexico, informed Castro that taking KMRC without his consent was illegal. Castro continued pressing Ruiz on the subject of the visit, although she was unwilling to commit to a time frame with respect to the length of the trip. At one point, Castro said she would go for three months. Later, she said six months. As Castro had not seen her parents in a long time, Ruiz ultimately consented to the request. I find the parties reached an agreement that Castro could take KMRC to Mexico on a seven month trip.

Because Castro needed Ruiz's permission to take KMRC out of the country, on October 25, 2011 Ruiz signed a notarized statement giving Castro permission to take KMRC "on their trip to Pachuca Hidalgo, Mexico. The trip is scheduled for departure on November 2nd, 2011 with an approximant [sic] 7 month stay, returning on May 15, 2012." Def. Ex. 110. Perhaps no one other than Castro knows if she ever really intended on returning to the United States. At the least, I find she convinced Ruiz she intended to return with KMRC in May 2012. Although Castro testified she and Ruiz always agreed the move to Mexico would be permanent, I find her testimony not credible. When pressed for an explanation as to why Ruiz wrote that Castro and KMRC would return in May 2015, Castro had no real explanation. If, as Castro testified, she and

Ruiz agreed this was a permanent relocation, Ruiz had no reason to put any return date on the permission slip. The permission slip, signed by Ruiz just days before Castro took KMRC to Mexico, combined with Ruiz's own credible testimony, is the best evidence of the parties' agreement. I find Ruiz credible when he says he only allowed KMRC to travel to Mexico under the condition he would return to the United States in May of 2012.

By May of 2012, contrary to her agreement with Ruiz, Castro had essentially settled in Mexico. KMRC at this time was one month past his third birthday. Castro married in August 2012 and lived on her parents' ranch in a rural area outside of Mexico City. Castro's parents also lived on the ranch, in another home yards away from Castro's home. Castro's new husband ("Pa Alfredo") brought two children into the new marriage. It is unclear if Ruiz knew Castro had married, but by this time Ruiz had concerns about Castro returning to the United States with his child. Ruiz testified he questioned Castro at this time and Castro's response was that a return might not be possible as she had started a new relationship. Ruiz asked Castro to send KMRC back to the United States in accordance with the parties' agreement. Ruiz testified he told Castro "I want to see the boy. Send him to me." Castro did not agree but said she would send KMRC at some later point if Ruiz gave her an extension. Ruiz testified, convincingly to me, that he really had no choice at this time but to agree to an extension. On June 15, 2012, Ruiz signed a second notarized permission slip. Pl.'s Ex. 3. This slip extended the Mexico trip, "scheduled for departure on November 2, 2011 with an approximate returning date of May 15, 2014." I find that by June 2012, Castro made the unilateral decision to keep KMRC in Mexico.

Complicating this matter is the fact that neither Ruiz nor Castro can travel freely back and forth between Mexico and the United States. Ruiz, living in Oregon with his other children, could not simply fly to Mexico to get KMRC. Perhaps more accurately, while Ruiz could fly to

4 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Mexico, he might not be able to fly back. Castro attempted to minimize Ruiz's attempts to contact KMRC in Mexico. Once again, I find Ruiz's testimony more credible. Ruiz testified he called Castro attempting to speak with his son. But Castro usually made excuses why Ruiz could not talk to KMRC. For instance, Castro would say KMRC was sleeping or visiting with his grandparents. With Castro limiting even phone calls between Ruiz and his son, and with Castro simply not returning in accordance to the original agreement, Ruiz had to agree to the two year extension as his best hope for his son to someday return to the United States. I find Ruiz consistently held the desire and belief that KMRC would one day return home to live permanently in the United States.

During the entire time KMRC remained in Mexico, Ruiz continued to make relatively consistent child support payments to Castro. Castro attempted, in testimony here and in filings she made in Mexican courts, to minimize the payments. But Ruiz's bank documents refute Castro's testimony. Ruiz made these payments despite not being able to communicate with his son and despite not knowing exactly when, if ever, KMRC would return to the United States.

Like the first deadline to return, the second deadline came and went. Eventually, by September 2015, Castro decided to send KMRC to live in Oregon with her sister for two months. Castro, her sister, and her parents all testified the purpose of this trip was for KMRC to receive medical treatment for a neck issue. As no one ever even attempted to make an appointment for KMRC to see a doctor, this explanation appears odd. I remain puzzled as to the purpose of this trip. Perhaps Castro experienced domestic troubles at this time and needed to send KMRC to a safer place. There is certainly evidence which could support such a theory. Another theory could be that Castro was afraid that Ruiz's support payments would cease if Castro did not allow the child to visit his father. It may be that Castro simply wanted KMRC to see his father. Each

5 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

theory seems more plausible than Castro's own, that KMRC went to the United States solely for medical treatment (that no one ever bothered to arrange once he arrived) for a condition that she was unable to adequately describe. For whatever reason, on September 10, 2015, Castro sent KMRC, accompanied by his grandparents, back to the United States. Nearly four years had passed since six year old KMRC last set foot in the United States.

Once again, Ruiz provided a notarized permission slip for KMRC to travel. Pl.'s Ex. 4. This slip states KMRC and his grandparents will arrive in "the United States on September 10 of 2015 and they all going [sic] to go back on december 10 of 2015." Castro argues this slip signed by Ruiz demonstrates his intention that KMRC would return to Mexico after only a short visit. As with the second permission slip, I find Ruiz by this point would sign pretty much anything if, in his mind, it increased his chances of seeing his son. I certainly do not see this third slip as demonstrating Ruiz had conceded (or agreed) that KMRC would remain in Mexico. His later action of retaining his child is inconsistent with an intent that the child should return to Mexico.

In Oregon, KMRC would stay with Castro's sister Edilia. Edilia made no attempt to have KMRC meet with a medical professional. Edilia, apparently acting on behalf of Castro, agreed that Ruiz could pick up KMRC on Friday evening and return him on Sunday evening. Edilia and Ruiz signed a notarized permission slip. Pl.'s Ex. 9. In addition to laying out the visitation agreement, the slip states, "I Bulmaro Ruiz Perez agree what is written on Edilia's letter and that I will not cause any trouble when my son KMRC is here in the united states." This statement reveals some concern that Ruiz might try to keep KMRC in the United States. It reinforces my findings that: (1) Ruiz never agreed that KMRC would remain permanently in Mexico; and (2) Castro unilaterally decided in June 2012 that KMRC would remain with her in Mexico.

6 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

During the second or third visit, Ruiz noticed some scars or bruising on KMRC. Ruiz questioned KMRC, who allegedly told Ruiz that Pa Alfredo and Castro beat him with a belt. Ruiz photographed the alleged bruises and scars. While there is clearly some evidence of corporal punishment while KMRC was in Mexico, it is difficult to discern exactly how serious or abusive this punishment was. Although Castro disputes any corporal punishment occurred, I find Ruiz was concerned enough that he refused to return KMRC to Edilia and contacted Oregon's Department of Human Services ("DHS").

Jose Maciel is a DHS child protective service worker who interviewed KMRC upon receiving Ruiz's complaint. Maciel has extensive training and experience in the forensic interviewing of children exposed to trauma. Maciel conducted such an interview of KMRC in Spanish. Although KMRC was only six years old, Maciel concluded he articulated his home life well for his age. KMRC told Maciel some things occurred in Mexico "that were not alright with him." For instance, KMRC said he had to hide to avoid being beaten with a belt. Specifically, KMRC said he had to hide from Castro while doing homework to avoid being hit with a belt. KMRC reported Pa Alfredo struck him with a branch on two occasions. KMRC also spoke of some instances of domestic violence in Mexico. On one occasion, KMRC told Maciel he witnessed Pa Alfredo grab Castro's hair with both hands and drag her from the living room to the bedroom. Based on his experience, Maciel found KMRC to be credible, with no indication of "coaching." Maciel noted KMRC "crawled into a shell when describing the abuse" and included great detail when speaking with Maciel. Maciel inspected KMRC for bruises but found none. Despite multiple attempts, Maciel could not reach Castro or her family to get their side of the story.

7 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

At the start of KMRC's two month visit to the United States, Edilia enrolled him in a local school. KMRC exhibited aggressive behavior. The school referred KMRC to Jason Chin, a mental health therapist with Linn County Mental Health. At the time of trial, Chin had worked with KMRC for about six months. KMRC told Chin there was a time in Mexico when he was hit without really knowing why, perhaps for not doing chores or homework. Because Chin's role was that of a therapist and not a forensic investigator, Chin did not press KMRC for details. Chin diagnosed KMRC with Post Traumatic Stress Disorder ("PTSD"). Although KMRC was not very specific, Chin interpreted the abuse as violence towards KMRC, not domestic violence against Castro. Chin felt KMRC progressed well in the past six months. Initially quiet and reserved, KMRC is now more engaged. Chin noted KMRC had stabilized in school.

In the weeks and months after Ruiz refused to return KMRC to Edilia, the parties filed multiple custody-related pleadings in courts in Mexico and Oregon. On October 20, 2015, Ruiz requested an "Immediate Danger" order in Linn County Circuit Court. Def. Ex. 1. On October 26, 2015, Ruiz served Castro with the filings. Def. Ex. 2. Castro admitted being served in Mexico. Importantly, these documents contained Ruiz's Oregon address. After being served with the Oregon proceedings, Castro filed her own cases in Mexico state court. In fact, Castro filed two cases. In each, she alleged Ruiz failed to fulfill his parental financial support obligations. Castro also informed those courts Ruiz lived in Mexico. In doing so, it appears Castro was attempting to get a Mexican version of a default judgment against Ruiz. Castro had no meaningful explanation for lying in these documents. As noted, she had Ruiz's address in Oregon from being served as part of the Oregon case. She was well aware that Ruiz was living in Oregon with her child. I find Castro intentionally misled the Mexican courts into believing Ruiz lived near Castro in a rural area outside Mexico City.

8 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Castro's actions are, of course, perfectly understandable given her predicament. Like most parents, Castro simply did whatever she felt she had to do to see the return of her child. But Castro's actions confirm that she will say or do just about anything, even in open court, when her child's future hangs in the balance. Unfortunately for Castro, this case resolves around a dispute concerning the parties' agreement when Castro first took KMRC to Mexico in November 2012. The resolution of that question is critical to the outcome here. While Castro now swears Ruiz knew all along that once she left she would never return, I conclude that Castro is simply saying what she feels she needs to say to influence a court to order KMRC's return to Mexico.

## CONCLUSIONS OF LAW

Adopted on October 25, 1980, the Hague Convention on the Civil Aspects of International Child Abduction, 19 I.L.M. 1501 (the "Convention") is an international treaty establishing procedures for "the prompt return of children wrongfully removed or retained in any Contracting State." Convention, Art. 1(a), 19 I.L.M. at 1501. Congress enacted the International Child Abduction Remedies Act, 24 U.S.C. §§ 11601-11610 to implement the Convention. § 11601(b). Mexico and the United States are both signatories to the Convention.

The Convention aims to discourage forum shopping in international custody disputes. *Holder v. Holder*, 392 F.3d 1009, 1013 (9th Cir. 2004). The role of the court applying the Convention is solely to determine the rights available under the Convention, as opposed to the merits of the underlying child custody claim. *Id.* at 1013-14; § 11601(b)(4). In other words, the court does not "determine whether a child is happy where it currently is, but whether one parent is seeking unilaterally to alter the status quo with regard to the primary locus of the child's life." *Mozes v. Mozes*, 239 F.3d 1067, 1079 (9th Cir. 2001).

The Convention only requires the return of a child whose removal or retention was "wrongful":

> The removal or the retention is to be considered wrongful where -
>
> a) it is in breach of rights of custody attributed to a person . . . under the law of the state in which the child was habitually resident immediately before the removal or retention; and
>
> b) at the time of removal or retention those rights were actually exercised, . . . or would have been so exercised but for the removal or retention.

Convention, Art. 3, 19 I.L.M. at 1501.

In determining whether the removal or retention was "wrongful" under the Convention, courts answer four questions:

> (1) When did the removal or retention take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?

*Mozes*, 239 F.3d at 1070. The petitioner must establish that the removal or retention was "wrongful" by a preponderance of the evidence. § 11603(e)(1)(A).

Here, the only disputed issue regarding whether Ruiz wrongfully retained KMRC is the issue of KMRC's country of habitual residence. If KMRC's country of habitual residence is the United States, Castro's petition must be denied because the Convention applies only when a child is wrongfully retained or removed in a country other than one's country of habitual residence. In my mind, this issue is a close call. Here, Castro made the unilateral decision to change KMRC's country of habitual residence from the United States to Mexico. Ruiz never consented or acquiesced to that change. Instead, Ruiz always firmly wished for KMRC to return to live in the United States. I recognize that many judges would conclude as a matter of law that a six year old child who lives four years with his mother in her native country is now a habitual

10 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

resident of that country. My reading of *Mozes*, however, along with practically no evidence of KMRC's acclimatization in Mexico, leads me to conclude otherwise. I conclude Castro failed to meet her burden of demonstrating Mexico is KMRC's country of habitual residence.

Because "children . . . normally lack the material and psychological wherewithal to decide where they will reside[,]" courts look to the intentions of those entitled to fix the child's residence when determining the habitual residence of a child. *Mozes*, 239 F.3d at 1076. A young child may acquire a new habitual residence in one of two ways: (1) through the parents' shared settled intention to abandon the initial habitual residence; or (2) if "the objective facts point unequivocally to a person's ordinary or habitual residence being in a particular place." *Id.* at 1081 (internal citations omitted).

There is no dispute that when KMRC was born, he was a habitual resident of the United States. KMRC was born in Oregon. Both of his parents had lived in Oregon for years and, at least at that time, had no intention of leaving. KMRC then spent the next 30 months or so in the United States. The question here is at what point does a young child abandon one habitual residence and acquire a new one when one parent unilaterally decides to keep the child in a new country? This question becomes a closer one when, as here, the parent does not flee with the child to a new country in the middle of the night. Here, Castro had Ruiz's permission to travel for seven months to Mexico, Castro's native land.

The Ninth Circuit first analyzed the term "habitual residence" in *Mozes*. There, after living in Israel for their entire lives, the mother, with father's consent, brought the children to the United States. The parents agreed on a trip of 15 months, but lacked any real agreement on what the family would do after that time. After a year in the United States, the mother filed for divorce

11 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

and the father filed a petition under the Hague Convention. The children ranged from five to nine year old.

The court discussed the primary goal of the Convention, which is to deter the "unilateral removal or retention of children by parents, guardians, or close family members." *Mozes*, 239 F.3d at 1070. To accomplish this goal, the convention deters forum shopping by the abductor—often the "primary motivation" for the abductor—by ordering the return of the child to that child's habitual residence. *Id.* In most cases, the habitual residence question is outcome determinative. Absent a few narrow exceptions, a court must either order the prompt return of the child to its country of habitual residence or, if the child is already in that country, dismiss the petition. As the *Mozes* court noted, facts in Hague Convention cases are seldom "ordinary." This case—where, after four years in a new country, the original wrongful retainer seeks return of the child following a two month trip to the original habitual residence—is even less ordinary.

In *Mozes*, the court described four scenarios commonly arising in Hague cases:

> On one side are cases where the court finds that the family as a unit has manifested a settled purpose to change habitual residence, despite the fact that one parent may have had qualms about the move. Most commonly, this occurs when both parents and the child translocate together under circumstances suggesting that they intend to make their home in the new country. When courts find that a family has jointly taken all the steps associated with abandoning habitual residence in one country to take it up in another, they are generally unwilling to let one parent's alleged reservations about the move stand in the way of finding a shared and settled purpose.

> On the other side are cases where the child's habitual translocation from an established habitual residence was clearly intended to be of a specific, delimited period. In these cases, courts have generally refused to find that the changed intentions of one parent led to an alteration in the child's habitual residence.

> In between are cases where the petitioning parent had earlier consented to let the child stay abroad for some period of ambiguous duration. Sometimes the circumstances surrounding the child's stay are such that, despite the lack of perfect consensus, the court finds the parents to have shared a settled mutual

intent that the stay last indefinitely. When this is the case, we can reasonably infer a mutual abandonment of the child's prior habitual residence. Other times however, circumstances are such that, even though the exact length of the stay was left open to negotiation, the court is able to find no settled mutual intent from which such abandonment can be inferred.

239 F.3d at 1076-77 (internal footnotes omitted).

This case involves multiple scenarios described above. When Castro first took KMRC to Mexico, the parties agreed on a "specific, delimited period" of seven months. After those seven months, Castro simply decided to stay in Mexico with KMRC. The parties then negotiated, for lack of a better term, on an extension. Castro, however, held all the cards in this negotiation. Ruiz could not leave the country and simply had to agree to whatever Castro suggested. Agreeing to whatever terms Castro supplied represented Ruiz's only chance for KMRC's return to the United States. As described above, I conclude Ruiz never abandoned the United States as KMRC's country of habitual residence.

But shared parental intent is not the only way a child can acquire a new habitual residence. At some point, a child obtains a new habitual residence if "the objective facts point unequivocally to a person's ordinary or habitual residence being in a particular place." *Id.* at 1081 (quoting *Zenel v. Haddow*, 1993 S.L.T. 975, 979 (Scot. 1st Div.)). This question is easier asked than answered. Courts look to a child's acclimatization to a new country and, indeed, to all the facts of the particular case in determining how deeply rooted the child's ties are to the new country. Put another way, would returning the child to a particular country "be tantamount to sending them home?" *Holder*, 392 F.3d 1019.[5]

---

[5] The younger the child, the harder it is to overcome the lack of shared parental intent. *See Holder*, 392 F.3d at 1020-21 ("it is practically impossible for a newborn child, who is entirely dependent on its parents, to acclimatize independent of the immediate home environment of the parents.").

13 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Regarding KMRC's acclimatization in Mexico from 2012 to 2016, I note a surprising dearth of evidence presented by Castro on this issue. Other than a few isolated statements from Castro and her parents that KMRC was "happy" in Mexico, there is literally no evidence from Castro about how KMRC acclimated to Mexico. Other than an inference that the Oregon school had to get KMRC's records from a school in Mexico, we do not even know for sure if KMRC attended school in Mexico. If so, we certainly do not know how he did or how well he fit in. As noted by Ruiz during trial, Castro rested without offering the bulk of her documents into evidence.[6] As for what is in evidence, there is practically no evidence to show KMRC acclimated in any way at all to life in Mexico.[7] We know KMRC lived with Castro, Pa Alfredo and two siblings or half-siblings. We know Castro's parents live on the same plot of land. We know it is a rural area described as a "ranch." We know from pictures Castro submitted from DIF, essentially the Mexican equivalent of DHS, that the home is relatively clean and there is food in the refrigerator. We know Castro and her parents said KMRC was happy there. We know Castro and her parents denied any abuse or corporal punishment. But at least from Castro, that is literally all the court knows about KMRC's life in Mexico.

Ruiz, however, presented evidence that KMRC did not acclimatize to life in Mexico. As noted, Chin concluded KMRC's time in Mexico resulted in PTSD. Chin rejected Castro's contention that the stressors leading to KMRC's behavioral problems were associated with his

---

[6] Castro submitted a witness list, ECF No. 31, stating she would call KMRC's teacher from Luis Donaldo Colosio School. This witness was to provide testimony that: (1) KMRC was not a rebellious child; (2) KMRC always arrived at school well-groomed and with homework complete, accompanied by Castro and Pa Alfredo; and (3) Castro and Pa Alfredo participated in school activities with KMRC. Castro never called this witness. Castro also never called the ten or so other witnesses listed who would testify as to KMRC's life in Mexico with Castro and Pa Alfredo.

[7] I assume that KMRC acclimated the same as any other young child would in a new country. In other words, I imagine KMRC enjoyed a relatively happy life. All children, across genders and nationalities, are remarkably resilient. It is precisely this fact that some courts, and *Mozes* appears to be one such court, instruct that the proper inquiry remains on the shared intentions of the parents rather than some inquiry into how "happy" a child appears in its new surroundings.

14 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

retention by Ruiz. In Chin's opinion, any stress from the retention would result not in PTSD, but in an adjustment disorder (which KMRC did not have). Maciel testified that KMRC was credible regarding abuse that occurred in Mexico. I conclude some form of corporal punishment occurred in Mexico, and that this impacted KMRC's acclimatization in the sense that he appeared to not feel completely safe there. As noted above, I conclude Castro limited Ruiz's interactions with KMRC in Mexico. This too could not have helped KMRC acclimate to a new place. I conclude that even nearly four years spent in Mexico could not overcome the lack of shared parental intent to acquire a new habitual residence. *See Mozes*, 239 F.3d at 1078 ("when circumstances are such as to hinder acclimatization, even a lengthy period spent [with both parents in a new country] may not suffice" to alter a child's habitual residence). The only credible evidence demonstrates KMRC never really acclimated to life in Mexico.[8]

*Mozes* pointed out the tightrope courts walk when determining the amount of time necessary for a young child to acquire a new habitual residence absent shared parental intent. On the one hand, "courts should be slow to infer from [a child's contacts in the new country] that an earlier habitual residence has been abandoned." *Id.* at 1079. On the other hand, some amount of time will lead to the inevitable conclusion that, even absent shared parental intent, a child at some point becomes a habitual resident of the new country. *Id.* at 1081 n.42 (a child living 15 years in new country after wrongful removal is clearly a habitual resident of new country). As noted, at some point, a child obtains a new habitual residence if "the objective facts point unequivocally to a person's ordinary or habitual residence being in a particular place." *Id.* at 1081 (quoting *Zenel*, 1993 S.L.T. at 979). On this record, where the facts demonstrate that rather

---

[8] I assume courts must inquire as to a child's acclimatization to a new country in part because, absent shared parental intent, more than the simple accumulation of a sufficient number of days is required to obtain a new habitual residence.

15 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

than acclimating to life in Mexico, KMRC instead developed PTSD and never felt entirely safe there, I conclude Castro failed to establish that Mexico was KMRC's habitual residence in October 2015.[9]

Although I conclude Castro did not meet her burden of proving, by a preponderance of the evidence, that KMRC's country of habitual residence was Mexico, I turn next to Ruiz's affirmative defense. As noted, the habitual residence issue is, in my mind, a very close question. Assuming the Ninth Circuit disagrees with my conclusion, this analysis is appropriate in the interests of judicial economy and, in the event this court's habitual residence analysis is incorrect, to allow for a faster reunion of Castro and KMRC.

Ruiz argues returning KMRC to Mexico would subject KMRC to a grave risk of harm. A court shall not order the return of a child if respondent establishes, by clear and convincing evidence, that there is a grave risk of physical or psychological harm if the child is returned. Convention, Art. 13(b), 19 I.L.M. at 1502. A serious risk of harm is not enough to prevent the prompt return of a wrongfully removed or retained child; the risk must be grave. *See Gaudin v. Remis*, 415 F.3d 1028, 1036-37 (9th. Cir. 2005) (quoting 51 Fed.Reg. at 10509). Although the living situation prior to removal may be relevant, the focus is on the situation into which the child would be returned. *Baxter v. Baxter*, 423 F.3d 363, 374 (3rd Cir. 2005); 51 Fed.Reg. at 10506.

The *Gaudin* court noted that the grave risk exception is a narrow one and "the question is whether the child would suffer serious abuse that is a great deal more than minimal." *Id.* at 1035

---

[9] While I recognize Mexico is Castro's native country and thus presents a somewhat easier acclimatization for KMRC, *see Mozes*, 239 F.3d at 1082, I find Ruiz only agreed to the seven month trip, a trip with "clear limitations." Additionally, as noted above, Castro presented almost no evidence of any acclimation by KMRC.

16 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

(internal citations and quotations omitted). The court also emphasized how the exception fits within the overall purpose of the act:

> Moreover, because the Hague Convention provides only a provisional, short-term remedy in order to permit long-term custody proceedings to take place in the home jurisdiction, the grave-risk inquiry should be concerned only with the degree of harm that could occur in the immediate future. Because psychological harm is often cumulative, especially in the absence of physical abuse or extreme maltreatment, even a living situation capable of causing grave psychological harm over the full course of a child's development is not *necessarily* likely to do so during the period necessary to obtain a custody determination.

*Id.* at 1037. This case involves allegations of physical and psychological abuse.

While I am reluctant to describe the corporal punishment or domestic abuse in this case as "minimal," I conclude Ruiz has failed to demonstrate by clear and convincing evidence that these facts fit the "grave risk" exception. I conclude KMRC was exposed to some form of corporal punishment. On a few occasions, KMRC appears to have been hit with a belt. On two other occasions, KMRC may have been hit with a branch or switch. KMRC mentioned one incidence of domestic violence where Pa Alfredo allegedly dragged KMRC by her hair into a bedroom.[10] I find that while there likely was an instance of Pa Alfredo dragging KMRC by her hair, that this type of domestic violence was not a common occurrence during KMRC's years in Mexico. I find the pictures taken by Ruiz of KMRC's alleged scars and bruises do not portray any injuries caused by abuse. Rather, the scars and bruises look to be normal scars and bruises found on any active six year old boy. I note Maciel, trained to investigate instances of child abuse, inspected KMRC for bruises within days of Ruiz's complaint and found none.

The instances noted above cause the court some concern. But they do not rise to the level of physical or psychological harm pointed to by other courts as demonstrating clear and convincing evidence of a "grave risk." For example, in *Van de Sande v. Van De Sande*, 431 F.3d

---

[10] Chin, however, testified KMRC described only abuse towards himself, as opposed to any against Castro.

17 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

567 (7th Cir. 2005), the father beat the mother several times per week. The beatings included choking, throwing the mother against the wall, and kicking her in the shins. The father also threatened to kill the children. In *Walsh v. Walsh*, 221 F.3d 204 (1st Cir. 2000), the beatings were even worse, resulting in chipped teeth, and facial swelling and cuts. And the father did not only beat the mother. After the father bested his adult son in a fistfight in the living room, he forced his eight year old daughter to walk downstairs, look at her bloody brother, and tell him to leave. In *Rodriguez v. Rodriguez*, 33 F.Supp.2d 456 (D. Md. 1999), the father beat his six year old son so badly with a belt that the son missed one week of school. This was on top of weekly beatings of the mother. After the mother fled, the father threatened to kill the mother's family.

The alleged harm in this case does not present a "grave risk" justifying not returning KMRC to Mexico. Had I concluded KMRC's habitual residence was Mexico, I would have granted Castro's petition and ordered KMRC returned to Mexico immediately. Because KMRC's habitual residence remains the United States, Castro's petition for return is DENIED.

IT IS SO ORDERED.

DATED this 7th day of December, 2016.

                                                                        _____/s/ Michael McShane_____
                                                                               Michael McShane
                                                         United States District Judge